IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | **CRIMINAL NO. 1:22-CR-42** |
| : | |
| **v.** : | **(Judge Conner)** |
| : | |
| **CARLOS ARIEL RAMOS,** : | |
| : | |
| **Defendant** : | |

**MEMORANDUM**

Defendant Carlos Ariel Ramos moves to suppress physical evidence seized by police during a search of an apartment he frequented. We will deny his motion.

**I.   Factual Background**[1]

In the spring of 2020, York City Police Department received an anonymous complaint of suspected drug dealing out of a residence at 725 Pennsylvania Avenue in York, Pennsylvania. (See Doc. 37-3 at 2). The complainant noted vehicles occasionally would idle in the alley (Monarch Avenue) located directly behind the house; someone would exit the rear of the building and briefly stop at the vehicle, and then the vehicle would drive off. (See id.) Officer Vincent J. Monte—a nine-year veteran of the Department and member of York County's Drug Task Force—investigated the complaint. (See id.) He knew from his training and experience the activity described by the complainant was consistent with drug dealing. (See id.) Additionally, at some point between 2019 and June 16, 2020, Officer Monte received a tip from a cooperating source that a "light skinned male with the nickname of

---

[1] The following factual narrative primarily derives from the affidavit of probable cause and related exhibits attached to Ramos's motion. (See Doc. 37-3).

'Sosa'" was selling drugs on the 700 block of Pennsylvania Avenue. (See id.) Officer Monte previously had investigated Ramos, who had pled guilty to two felony drug offenses in York County in 2015, and knew he went by "Sosa." (See id. at 3, 5). The source confirmed "Sosa" and Ramos were one and the same based upon a photograph Officer Monte displayed. (See id. at 3).

On June 15, 2020, Officer Monte and another police officer drove to Monarch Avenue and retrieved two bags of garbage from a pile deposited directly behind 725 Pennsylvania Avenue in anticipation of that morning's collection. (See id. at 2). Officer Monte later examined the bags' contents at another location. (See id.) He found mail addressed to Ramos in one of the bags, though the listed address was "527" Pennsylvania Avenue. (See id.) He also found "multiple clear plastic sandwich bags with the corners torn off and a quantity of loose marijuana" in the same trash bag, along with a "separate package" containing a small amount of marijuana. (See id. at 2-3). Officer Monte recalled from past drug investigations that marijuana dealers "commonly" employ a packaging method whereby they place marijuana in a plastic sandwich bag and "tilt it to one side, causing the substance to collect in the corner of the bag." (See id. at 3). The dealers will knot the marijuana-filled corner, cut it from the bag, and repeat the process with the other corner.[2] (See id.) "What then remains is a plastic sandwich bag with both bottom corners cut off," which they will discard. (See id.) Lastly, none of the

---

[2] Investigators sometimes refer to these drug-filled baggies as "corner ties." See United States v. Lackey, No. 1:17-CR-269, 2020 WL 3488701, at *3 & n.3 (M.D. Pa. June 26, 2020) (Conner, J.) (transcript citations omitted).

materials in the trash bags Officer Monte inspected contained commercial markings or other indicia suggesting the marijuana had been obtained lawfully from a licensed medical marijuana dispensary. (See id.)

Officer Monte surveilled 725 Pennsylvania Avenue on June 15 and 16. (See id. at 4). He observed Ramos coming and going from the building's front door, and he saw Ramos's brother, Joseph, exit via the front door. (See id.) Ramos also left through the front door once and walked to the rear of the property, where a wooden porch and steps provide access to the second floor. (See id. at 6). Officer Monte subsequently queried the Department's reporting system and discovered Ramos and a woman named Ashley Beatty had "reported a burglary at 725 Pennsylvania Avenue second floor" in October 2019. (See id.) The Commonwealth's driver's license database listed Beatty's address as "725 Pennsylvania Avenue Apartment 2." (See id.) With this information, Officer Monte swore out an affidavit of probable cause and requested a warrant to search the building's second floor apartment and curtilage for evidence of drug trafficking. (See id.) Officers executed the warrant on the morning of June 18 and seized, *inter alia*, three bags of marijuana, a digital scale, and two loaded firearms. (See Doc. 37-3, Ex. A-7, Property Receipt).

**II.   Procedural History**

A federal grand jury indicted Ramos in February 2022 on two counts of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Ramos pled not guilty and now moves to suppress all evidence seized from 725 Pennsylvania Avenue. The motion is fully briefed and ripe for disposition.

### III. Discussion

Ramos argues the warrant authorizing police to search 725 Pennsylvania Avenue was unsupported by probable cause. He also contends the good-faith exception does not apply. We disagree on both fronts.

#### A. Probable Cause

The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. See U.S. CONST. amend. IV; Horton v. California, 496 U.S. 128, 133 (1990). When searching a home, the constitutional default is that a warrant is required. See Payton v. New York, 445 U.S. 573, 586 & n.25 (1980) (citations omitted). For a search warrant to issue, a neutral magistrate must find, under the totality of the circumstances, that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). Courts reviewing such determinations do not make a *de novo* probable cause assessment; they "simply [] ensure that the magistrate had a substantial basis for . . . concluding that probable cause existed." United States v. Miknevich, 638 F.3d 178, 182 (3d Cir. 2011) (second alteration in original) (quoting Gates, 462 U.S. at 238-39).

The Supreme Court of the United States views probable cause as an amorphous concept, "not readily, or even usefully, reduced to a neat set of legal rules." See Ornelas v. United States, 517 U.S. 690, 695-96 (1996) (quoting Gates, 462 U.S. at 232). Its existence must be determined from the view of the officer on the street, not the judge in the courtroom. See United States v. Sokolow, 490 U.S. 1, 7-8 (1989); see also United States v. Cortez, 499 U.S. 411, 418 (1981). Whether

4

probable cause exists is an objective determination based upon the totality of the circumstances present at the time of the challenged governmental conduct. See United States v. Williams, 413 F.3d 347, 353 n.6 (3d Cir. 2005). Probable cause "is not a high bar." Kaley v. United States, 571 U.S. 320, 338 (2014).

Ramos trains his fire principally upon information gleaned from the "anonymous complaint" and the "cooperating source," which he attacks as uncorroborated and stale. (See Doc. 38 at 7-10). A magistrate may approve a warrant "relying primarily or in part" on information supplied by confidential informants, "so long as the totality of the circumstances gives rise to probable cause." See United States v. Stearn, 597 F.3d 540, 555 (3d Cir. 2010). The same is true for anonymous tips. See Alabama v. White, 496 U.S. 325, 328-29 (1990) (citing Gates, 462 U.S. at 230, 237). Statements made by unnamed sources are "not presumed to be credible." See United States v. Yusuf, 461 F.3d 364, 384 (3d Cir. 2006). A reviewing court should assess the information attributed to those sources for "indicia of reliability," including the informants' veracity, the basis of their knowledge, and police efforts to corroborate their accounts. See White, 496 U.S. at 328-29; United States v. Ritter, 416 F.3d 256, 262-63 (3d Cir. 2005). When an affidavit omits details about a source's identity that would aid a court's reliability analysis, affiants should "compensate[]" with more corroborating information obtained "through independent police work." See White, 496 U.S. at 330; Stearn, 597 F.3d at 555 (quoting Gates, 462 U.S. at 233).

Moreover, although creditable information may become outdated, the age of the information is not dispositive; it must be analyzed together with the "nature of

5

the crime and the type of evidence." See United States v. Zimmerman, 277 F.3d 426, 434 (3d Cir. 2002) (quoting United States v. Tehfe, 722 F.2d 1114, 1119 (3d Cir. 1983)). Averments suggesting a "course or pattern of ongoing and continuous" criminal activity diminish the significance of a tip's age, see United States v. Henley, 941 F.3d 646, 653 (3d Cir. 2019) (citing United States v. Urban, 404 F.3d 754, 774-75 (3d Cir. 2005) (collecting cases)), and stale details may be "refreshed with new information that relates back to the subject of the older information," see United States v. Cintron, 243 F. App'x 676, 679 (3d Cir. 2007) (nonprecedential) (citing Tehfe, 722 F.2d at 1120).

We conclude the issuing authority reasonably could credit the information supplied by the anonymous complainant and cooperating source because Officer Monte independently corroborated "significant aspects" of their accounts. See White, 496 U.S. at 331. To reiterate, Officer Monte averred the York City Police Department received an anonymous complaint of drug dealing within three months of the search at issue. (See Doc. 37-3 at 2). The complainant specifically identified 725 Pennsylvania Avenue as the source of drugs, and also described the manner in which people would drive behind the house to meet the alleged dealer. (See id.) Within the same year, a cooperating source familiar to Officer Monte told him an individual matching Ramos's description and going by his known nickname, "Sosa," was selling drugs on the same block. (See id.) The source confirmed Ramos's identity based upon a picture Officer Monte showed him. (See id.)

Officer Monte endeavored to corroborate both sources' information by personally surveilling 725 Pennsylvania Avenue. He observed Ramos coming and

6

going from the building over the span of two days, (see id. at 4), thus confirming the cooperating source's identification of the alleged dealer and his location on that block.[3] Officer Monte also obtained mail specifically addressed to Ramos from a garbage pile on the street just behind the building. (See id. at 2). Although the mail identified Ramos's address as "527" Pennsylvania Avenue, further review of police records confirmed Ramos and another resident reported a burglary at 725 Pennsylvania Avenue, "second floor," in October 2019. (See id. at 2-3). Given this link to the second-floor apartment, Ramos's suggestion that someone "brought trash" bearing his name from two blocks away and "deposited it" behind the very apartment from which he reported a break-in eight months earlier, (see Doc. 38 at 11), strains credulity. It is reasonable to assume the transposed house number simply was due to human error. See United States v. Dollson, No. 04-CR-402, 2004 WL 2577551, at *4 (E.D. Pa. Oct. 25, 2004) (excusing unintentional transpositional error in address used for search warrant).

As for the drug-trafficking connection, Officer Monte partially corroborated the anonymous complaint by conducting a trash pull the day before completing his affidavit. We recently addressed the "valuable corroborating evidence" trash pulls can yield in a case raising similar suppression issues. See United States v. Ledee, No. 1:21-CR-72, 2022 WL 2231823, at *4 (M.D. Pa. June 21, 2022) (Conner, J.) (citing

---

[3] Ramos ventured behind the property at least once while under surveillance, which is consistent with the *modus operandi* attributed to the alleged dealer by the anonymous complainant. (See Doc. 37-3 at 4). However, Officer Monte did not report seeing any vehicle traffic in the rear alley from which to infer a transaction took place, so this lone occurrence carries little weight.

United States v. Miller, 134 F. App'x 531, 533 (3d Cir. 2005) (nonprecedential); United States v. Harris, 118 F. App'x 592, 593-94 (3d Cir. 2004) (nonprecedential)). Because our court of appeals had not addressed the probative value of trash-pull evidence in a precedential opinion, we looked to other circuits' persuasive precedents supporting the proposition that such evidence generally is sufficient to establish probable cause "when proffered *in combination with* other facts, such as informant tips, police surveillance, or a defendant's prior convictions." See id. (collecting cases). Each of those enumerated factors is present here.

Officer Monte's inspection of the trash bags' contents revealed small quantities of marijuana and "multiple" clear plastic sandwich bags with the corners torn off, (see Doc. 37-3 at 2-3), a method commonly used to package drugs for sale, see Miller, 134 F. App'x at 533. Arguably a small amount of fresh marijuana or the burnt remnants of paraphernalia (*e.g.*, rolling papers, blunt wrappings, roaches, and the like), without more, is insufficient to establish probable cause for drug dealing. See, e.g., United States v. Ray, No. 1:19-CR-316, 2020 WL 6544840, at *1-2, 5 (M.D. Pa. Nov. 6, 2020) (Conner, J.) (trash pull revealing, *inter alia*, single corner tie with marijuana pieces, loose stems, lone roach, and "blunt guts" was "inconsiderable evidence . . . [not] suggestive of repeated or ongoing drug-related activity"); but cf. United States v. McDuffy, 636 F.3d 361, 364 (7th Cir. 2011) ("[E]ven a tiny bit of discarded drugs [found in trash pull] increases the likelihood that police will find more in the home.") (citations omitted). But the presence of conspicuously disfigured plastic sandwich bags—and the attendant dearth of liberated corners— supports the inference the loose marijuana was detritus from a drug-"vending"

8

operation, (see Doc. 37-3 at 2), rather than from personal consumption, cf. United States v. Hinnant, 529 F. App'x 217, 220 (3d Cir. 2013) (nonprecedential) (individualized "manner" of packaging relatively small amount of crack cocaine and absence of paraphernalia not "consistent with personal use").

To be sure, Officer Monte could have bolstered his affidavit by waiting to catch Ramos in the act with a prospective buyer. However, neither direct evidence of a hand-to-hand exchange nor a concrete link to the residence is required to credit the officer's averments. See Ritter, 416 F.3d at 262 (citing United States v. Burton, 288 F.3d 91, 103 (3d Cir. 2002); United States v. Jones, 994 F.2d 1051, 1056 (3d Cir. 1993)). Officer Monte knew Ramos had a "criminal history with drugs," making it more likely Ramos would "commit a drug trafficking crime than the public." See United States v. Henley, 941 F.3d 646, 655 (3d Cir. 2019). Two sources provided information within a 12-month period collectively suggesting Ramos was up to his old ways. And Officer Monte "refreshed" those tips by independently securing corroborating evidence of drug trafficking commingled with mail addressed to Ramos—which in all likelihood originated from the same location: 725 Pennsylvania Avenue—just one day before completing the search warrant application. See Cintron, 243 F. App'x at 679. Taken together, these facts provide a substantial basis upon which the magistrate could find probable cause to believe evidence of drug trafficking likely would be found in Ramos's second-floor apartment. The warrant to search that location thus satisfies constitutional dictates.

### B. Good-Faith Exception

Assuming *arguendo* the warrant lacked probable cause, we conclude the good-faith exception to the exclusionary rule applies. Under this exception, courts will not suppress evidence obtained through a subsequently invalidated search warrant if investigators acted in good faith when executing it—that is, "in the objectively reasonable belief that their conduct did not violate the Fourth Amendment." See United States v. Leon, 468 U.S. 897, 918 (1984); see also Stearn, 597 F.3d at 560 (quoting Leon, 468 U.S. at 918). The test is "whether a reasonably well[-]trained officer would have known that the search was illegal despite [judicial] authorization." United States v. Hodge, 246 F.3d 301, 307 (3d Cir. 2001) (quoting United States v. Loy, 191 F.3d 360, 367 (3d Cir. 1999) (quoting Leon, 468 U.S. at 922 n.23)); see also id. at 307-08 ("The mere existence of a warrant typically suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception.") (citing Leon, 468 U.S. at 922; United States v. Williams, 3 F.3d 69, 74 (3d Cir. 1993)).

Our court of appeals has recognized a few "rare circumstances" in which the good-faith exception does not apply: (1) when the affidavit relied upon by the magistrate is deliberately or recklessly false; (2) when the magistrate abandons their judicial role by failing to act in a neutral and detached manner; (3) when the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) when the warrant itself is "facially deficient" because it fails to particularize the place to be searched or things to be seized. See United States v. Pavulak, 700 F.3d 651, 664 (3d Cir. 2012) (quoting

Stearn, 597 F.3d at 561 & n.19) (internal quotation marks and citations omitted).  It may be unreasonable, for instance, for a police officer to rely upon an affidavit containing "mere conclusory assertions or a single piece of evidence."  See Williams, 3 F.3d at 74; see also Loy, 191 F.3d at 368 (same for "'bare bones' affidavit . . . lacking factual support").  A defendant seeking to counter an assertion of good faith faces a "high" bar in any event.  See Pavulak, 700 F.3d at 664 (quoting Messerschmidt v. Millender, 565 U.S. 535, 547 (2012)).

Ramos invokes the third circumstance.  Notwithstanding judicial approval, he believes Officer Monte should have known the affidavit was deficient "[g]iven his wealth of experience."  (See Doc. 38 at 15).  We disagree.  Officer Monte's affidavit contained pertinent facts from various sources, including his firsthand surveillance and his identification of physical evidence indicative of drug trafficking.  (See Doc. 37-3 at 2-3).  He also described his training and experience in drug-related investigations, his knowledge of telltale drug-trafficking techniques, and his familiarity with Ramos's criminal history.  (See id. at 2-4).  The affidavit linked the contraband and paraphernalia in the trash to Ramos, and Ramos to 725 Pennsylvania Avenue, Apartment 2.  (See id.)  A neutral and detached magistrate issued a warrant based upon that detailed information.  (See id. at 1); cf. Hodge, 246 F.3d at 307-08.  Under the circumstances, a reasonable officer could have believed the warrant and ensuing search were lawful.  Suppression is unwarranted.

## IV.     Conclusion

For all these reasons, we will deny Ramos's motion to suppress. An appropriate order shall issue.

                                              /S/ CHRISTOPHER C. CONNER
                                              Christopher C. Conner
                                              United States District Judge
                                              Middle District of Pennsylvania

Dated:     May 16, 2023